# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

420 West Queen Street, Apartment 3, Inglewood, California,
as further described in Attachment A

)
)
)
)
)
)

Case No. 2:18-MJ-2076

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512 | See attached Affidavit. |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Tristany Wagner, Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

AUSA: Tom Rybarczyk, x8452

## **ATTACHMENT A**

PREMISES TO BE SEARCHED

The premises located at 420 West Queen Street Apartment 3, Inglewood, California.  Apartment 3 is an apartment in a two story building with a light-tan façade and rock wall, the entrance of which faces Queen Street.  The apartment complex also has a back alley entrance, which appears to be gated.  As further stated in Attachment B, the search is limited to digital devices at the premises.



**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1512 (Obstruction: Destruction of Evidence), (the "Subject Offense") from digital devices found in the premises described in Attachment A, namely:

a.    Electronic records, communications, and information concerning plans to wipe and/or destroy electronic media;

b.    Records, documents, programs, applications, or materials showing searches and/or logins to any Apple-related websites, including but not limited to iCloud.com;

c.    Any communications, including records of telephone calls, text messages, emails, social media messages, and messages over messaging applications, exchanged with Macharee Shakur Crosby, Marcia Denise Bullard, William Crosby IV, and/or Myron Crosby, for the period of August 1, 2017 to present;

d.    Records, documents, programs, applications, or materials showing communications regarding wiping and/or deleting electronic media from digital devices, including how or when to do so remotely;

e.    Any digital device used to facilitate the above-listed violations (and forensic copies thereof);

ii

f.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

g.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

iii

manuals, that may be necessary to access the device or to conduct a forensic examination of it;

     viii.  records of or information about Internet Protocol addresses used by the device;

     ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

  3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

v

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

       ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

       c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

       f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

g.   The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

h.   After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

5.   In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

a.   Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

b.   Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

c.   Any magnetic, electronic, or optical storage
device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, with respect to Charlets Marie Hamm, Shaheed Abdul Mitchell, Marcia Denise Bullard, and Macharee Shakur Crosby, if they are located at the SUBJECT PREMISES during the execution of the search, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina- recognition feature, in order to gain access to the contents of any such device.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

viii

apply to any search of digital devices pursuant to any other
court order.

## AFFIDAVIT

I, Tristany Wagner, being duly sworn, declare and state as follows:

### I. PURPOSE OF THE AFFIDAVIT

1. This affidavit is made in support of an application for a warrant to search Charlotte HAMM's home, located at 420 West Queen Street, Apartment 3, Inglewood, California, (the "SUBJECT PREMISES"), as described more fully below and in Attachment A, for digital devices containing or themselves evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1512 (Obstruction: Destruction of Evidence), (the "Subject Offense"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

### II. BACKGROUND OF POSTAL INSPECTOR TRISTANY WAGNER

2. I am a Postal Inspector employed by the United States Postal Inspection Service ("USPIS") and have been so employed since April 2016. I am currently assigned to the Alameda Mail Theft team, where my responsibilities include the investigation of crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system. I regularly engage in observations, surveillance, searches, database research, apprehensions, and preparation of criminal and administrative cases for prosecution. I have participated in mail theft, identity theft, bank fraud, wire fraud, and robbery investigations which have resulted in federal or state criminal charges.

3.     I have completed a 12-week basic training course in Potomac, Maryland, which included online training related to cyber-crimes, mail theft, identity theft, postal related robberies and burglaries, as well as the policies and procedures of the US Postal Service ("USPS").  I have been trained in investigating various violations of federal law, including mail theft, identity theft, mail fraud, and robberies.  I have also worked with and learned from other agents and criminal investigators with extensive experience in robbery investigations.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.     On June 29, 2018, law enforcement executed a search warrant at the home of WILLIAM CROSBY IV ("WILLIAM") for his involvement in a conspiracy to rob postal trucks.  At approximately 6:30 a.m., during the execution of the search warrant, WILLIAM's mother, Marcia Denise Bullard ("Bullard") went to the SUBJECT PREMISES.  Agents later discovered that at approximately 6:46 a.m. on June 29, 2018, someone using a

2

digital device from the unique IP Address of the secured Wi-Fi
network of the SUBJECT PREMISES initiated a remote wipe of
WILLIAM's Telephone, deleting all of the data on WILLIAM's
Telephone.

## IV. STATEMENT OF PROBABLE CAUSE

6.    Based on my investigation, review of investigative
reports, and my discussions with Inspectors and other law
enforcement agents, I know the following:

### A.    WILLIAM CROSBY IV Indicted in Postal Burglary and Robbery Scheme

7.    WILLIAM was a USPS employee.  A USPIS and the United
States Secret Service investigation revealed that WILLIAM and
his half-brother MYRON CROSBY ("MYRON") conspired to rob a USPS
truck carrying USPS cash proceeds that had originated from the
Dockweiler Post Office on March 1, 2018.  The investigation also
revealed that WILLIAM had previously worked as an acting
supervisor at the Dockweiler Post Office in 2017 and assisted in
the burglary of a USPS truck carrying USPS cash proceeds on
August 1, 2017.  Additionally, investigators learned that
WILLIAM facilitated the February 1, 2018 robbery of a USPS truck
carrying USPS cash proceeds outside the Wagner Post Office,
where WILLIAM worked at the time.

8.    On July 24, 2018, a federal grand jury charged WILLIAM
and MYRON with Conspiracy, in violation of 18 U.S.C. § 371, and
Aiding and Abetting the Robbery of United States Property, in
violation of 18 U.S.C. §§  2114(a), 2(a), for their roles in the
March 1, 2018 robbery, in case number CR 18-468-SJO.  In the

3

same indictment, the grand jury charged WILLIAM with Aiding and
Abetting the Robbery of United States Property, in violation of
18 U.S.C. §§  2114(a), 2(a), for his role in the February 1,
2018 Robbery and Aiding and Abetting the Theft of Government
Property in Excess of $1,000, in violation of 18 U.S.C. §§  641,
2(a).  A copy of the indictment is attached and incorporated
herein as Exhibit 1.

### B. June 28, 2018 Complaint and Search Warrant and June 29, 2018 Search Warrant

9.   On June 28, 2018, the Honorable Charles F. Eick,
United States Magistrate Judge, signed a complaint and
authorized arrest warrants for WILLIAM CROSBY IV ("WILLIAM") and
MYRON CROSBY ("MYRON") for a violation of Title 18, United
States Code, Section 371 in case number 18-MJ-1689.  On the same
day, the Honorable Charles F. Eick, United States Magistrate
Judge, signed a search warrant authorizing the search of
WILLIAM'S home, 420 West Queen Street, Apartment 7, Inglewood,
California ("WILLIAM's Home"), and his vehicle, a 2007 Buick
Lucerne ("WILLIAM's Car"), in case numbers 18-MJ-1691 and 18-MJ-
1687, respectively.  On June 29, 2018, the Honorable Charles F.
Eick, United States Magistrate Judge, signed a search warrant
authorizing the search of WILLIAM's iPhone 6S ("WILLIAM's
Telephone"), which was seized on June 29, 2018, when he was
arrested pursuant to the federal arrest warrant, in case number
18-MJ-1695 (the "Cellphone Warrant").

## C.  Arrest of WILLIAM

10.  On June 29, 2018, Inspectors arrested WILLIAM outside of 10247 S. 2nd Avenue in Inglewood, California (the "2nd Avenue Address"). The Inspectors saw WILLIAM walking to WILLIAM's Car and told him he was under arrest pursuant to the federal arrest warrant.  As the Inspectors informed WILLIAM that he was under arrest, they saw he held a cellphone in his hand ("WILLIAM's Telephone").  The Inspectors asked him to place WILLIAM's Telephone on top of the car.  At that time, Inspectors seized WILLIAM's Telephone.

11.  Later, when Inspector Lovelace and United States Secret Service Special Agent Alfred Rossi took custody of WILLIAM and WILLIAM's Telephone outside the Second Avenue Address, Inspector Lovelace placed WILLIAM's Telephone into airplane mode.  While transporting WILLIAM to the USPIS office, WILLIAM asked SA Rossi if the vehicle he was being transported in was an Envoy.[1]  SA Rossi and Inspector Lovelace had not asked WILLIAM any questions to this point.  SA Rossi said it was an Envoy.  WILLIAM responded by asking if the Envoy, which is a GMC vehicle, was brown.  SA Rossi confirmed that it was a brown Envoy.  Inspector Lovelace asked why WILLIAM asked these questions.  WILLIAM said he "knew it" and asked SA Rossi if he knew he had a headlight out.  At the USPIS office, SA Rossi checked and the headlight was not functioning correctly.

---

[1] At this point, no law enforcement officers had advised WILLIAM of his <u>Miranda</u> rights.

5

12.   On June 22, 2018, SA Rossi and Inspector Lovelace had followed WILLIAM in WILLIAM's Car in SA Rossi's brown Envoy. During their surveillance operation, at approximately 9:30 p.m., WILLIAM left in his car from a barbershop, and SA Rossi and Inspector Lovelace followed in their Envoy.  WILLIAM's Car made a series of turns, which, based on SA Rossi and Inspector Lovelace's training and experience, suggested to them that WILLIAM was attempting to lose the vehicle following him.  At some point, SA Rossi and Inspector Lovelace lost track of WILLIAM's Car when it began to travel at an unsafe speed.

13.   Based on my training and experience, I am aware that if suspects involved in criminal activity "make" or determine that they are being followed, these suspects may take active measures to further conceal their crimes, including planning to have other individuals destroy evidence of their crimes.

### D.   An Individual Using the SUBJECT PREMISES's IP Address Remotely Wiped WILLIAM's Telephone

14.   Later, on June 29, 2018, while executing the Cellphone Warrant on WILLIAM's Telephone, USPIS Inspector Jordan Lovelace and SA Alfredo Rossi attempted to connect WILLIAM's Telephone to a secure WiFi network.  As SA Rossi and Inspector Lovelace attempted to connect the phone over a secure WiFi network, an immediate full wipe of the phone was remotely initiated, deleting previously stored data on the phone's hard drive.[2]

---

[2] SA Rossi said he was able to shut off WILLIAM's Telephone before the wipe was complete.  However, after speaking with the forensic examiners from the USPIS laboratory, SA Rossi learned that the once technicians turn on the WILLIAM's Telephone again, it will complete the remote wipe even if the cellphone is in airplane mode or not receiving any signal.

15.    Based on my training and experience and my review of publicly available resources, I know that Apple allows its users to erase data from digital devices through an Apple iCloud account.   I understand that Apple iCloud accounts are generally password-protected.   Once a person enters the password into an Apple iCloud account and initiates a remote wipe of a linked Apple device, if the device is offline, the remote wipe will initiate the next time the device is connected to a data network such as WiFi, 3G, 4G, or LTE.

16.    On June 16, 2018, the Honorable Jean P. Rosenbluth, United States Magistrate Judge signed a search warrant authorizing the search of WILLIAM's Apple account for Apple ID lm310ca@aol.com ("WILLIAM's Account"), as well as accounts associated with WILLIAM's telephone number, in case number 18-MJ-1583.   On June 8, 2018, the Honorable Rozella A. Oliver, U.S. Magistrate Judge, signed an order requiring Apple, Inc. to disclose information pursuant to 18 U.S.C. § 2703(d) for accounts associated with the William's Telephone number.   In response to that order, the Provider provided the following accounts associated with the Subject Telephone: (1) williamcrosby100@icloud.com; and (2) lm310ca@aol.com.   Both the williamcrosby100@icloud.com and lm310ca@aol.com list WILLIAM as the subscriber.

17.    On July 5, 2018, Apple provided information in response to the warrant for information from WILLIAM's Account. During SA Rossi and Inspector Lovelace's review of the information provided by Apple, they saw that the information

7

reflected that a remote wipe of WILLIAM's Telephone was initiated from IP address 76.175.134.197 (the "Subject IP Address") at 6:46 a.m. PDT on June 29, 2018.

18.  At the time the remote wipe was initiated, WILLIAM was in federal custody and as discussed above, the telephone was in airplane mode.  Based on my training and experience, placing an iPhone like WILLIAM's Telephone in airplane mode would prevent the phone from being wiped remotely until it was later connected to Wi-Fi.

19.  Using an open source website, SA Rossi determined the Subject IP Address had been assigned to Charter Communications, Inc.

20.  On July 16, 2018, Charter Communications provided records showing that the Subject IP Address was assigned to a "Charlets Black" with the subscriber's address being the SUBJECT PREMISES at 6:46 a.m. Pacific on June 29, 2018.

21.  On July 23, 2018, Postal Inspector Wilford Claiborne went to the SUBJECT PREMISES to ascertain if Wi-Fi connectivity in the localized area included publicly-available networks, i.e., networks that can be accessed without a password, or private password protected networks.  Using a Wi-Fi search on his cellular device, Inspector Claiborne was able to see that all the networks in the area surrounding the SUBJECT PREMISES were secure private networks and there were no publicly open networks in or around the SUBJECT PREMISES.  Based on the preceding information, secure private networks require a password to login.  Based on my training and experience, the

8

remote wipe enacted from the Subject IP Address could only have been enacted by someone with knowledge of both the password-protected login information for the secure private network at the SUBJECT PREMISES and the password-protected login information for WILLIAM's iCloud account.

**E.   During the search of WILLIAM's Home, WILLIAM's Mother Went to the SUBJECT PREMISES**

22.   In anticipation of executing a search warrant on WILLIAM's Home, on July 28, 2018, while conducting surveillance at the apartment building in which WILLIAM's Home and the SUBJECT PREMISES are both located, Inspector Lovelace spoke to a man he later identified as Shaheed Abdul Mitchell ("Mitchell") outside of the entrance to the SUBJECT PREMISES.  Inspector Lovelace (who was undercover at the time) asked Mitchell how much the rent was and Mitchell replied that he did not know because he lived with his mother who paid the rent.  Inspector Lovelace noted that the SUBJECT PREMISES was the unit downstairs from William's Home, just to the right of the stairwell.

23.   On July 18, 2018, SA Rossi reviewed records obtained from law enforcement databases regarding the SUBJECT PREMISES. Records show that Charlets Marie Hamm, Shaheed Abdul Mitchell and three others are associated with the SUBJECT PREMISES. According to California DMV records, however, only Charlets Marie Hamm, 43, and Mitchell, 25, live at the SUBJECT PREMISES. DMV records show the other individuals living at different locations.  On July 18, 2018, Inspector Lovelace reviewed Mitchell's California Department of Motor Vehicle photograph and

confirmed that he was the same person with whom Inspector
Lovelace spoke with in front of the SUBJECT PREMISES entrance on
June 28, 2018.

24.   On June 29, 2018, law enforcement executed the search
warrant at WILLIAM's Home.  At WILLIAM's Home that morning,
inspectors found WILLIAM's sister, Macharee Shakur Crosby, and
WILLIAM's mother, Bullard, inside.  WILLIAM's sister left
WILLIAM's HOME at approximately 6:20 a.m. because she said she
had to go to school.  At approximately 6:30 a.m., Bullard told
Inspectors she did not want to remain in WILLIAM's Home and
would go downstairs to a neighbor's house.

25.   Later on June 29, 2018, United States Postal Service-
Office of Inspector General SA Robert Knight said that after the
investigators completed the search, he found Bullard at her
friend's apartment, which was downstairs from WILLIAM's Home
just to the right of the stairwell, and told her the search was
completed, at approximately 8:10 a.m.

26.   Based on the pre-search warrant surveillance by
Inspector Lovelace and the description provided by SA Knight, I
believe that SA Knight found Bullard at the SUBJECT PREMISES on
June 29, 2018, when he told her that the search of WILLIAM's
Home was complete.

27.   Based on my training and experience, individuals
involved in armed robberies and burglaries often devise
contingency plans among immediate family members and close
friends and neighbors to erase evidence of a crime from their
electronic media in case of an arrest.  This deletion of files

10

on an Apple iPhone can be accomplished remotely by someone an individual trusts to conduct the remote wipe if the individual provides his or her iCloud username and password.

### V.   TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSE

28.   Based on my training and experience, and information I have obtained from other law enforcement officers, I know the following:

a.   As discussed above, individuals involved in armed robberies and burglaries often have contingency plans in place to destroy electronic evidence should he or she get arrested. Accomplices who assist in deleting such evidence often communicate with each other via telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending text messages and other communications related to the contingency plan to destroy evidence.

b.   Digital devices used to facilitate the deletion of electronic evidence will often retain evidence that an individual used that digital device to erase evidence either on the device itself or remotely on another device.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

29.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

11

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices
will typically be so large that it will be highly impractical to
search for data during the physical search of the premises.  A
single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text.  Storage devices capable of storing 500 or
more gigabytes are now commonplace.  Consequently, just one
device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive
could contain as many as approximately 450 full run movies or
450,000 songs.

d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded

13

onto a hard drive, deleted, or viewed via the Internet.[3] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive

---

[3] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

        e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence

15

in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

         f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

    30.  Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by

using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.  In addition, decryption of
devices and data stored thereon is a constantly evolving field,
and law enforcement agencies continuously develop or acquire new
methods of decryption, even for devices or data that cannot
currently be decrypted.

     31.  As discussed herein, based on my training and
experience I believe that digital devices will be found during
the search.  Specifically, as discussed above, an individual
using a digital device connected to the Subject IP Address
logged into WILLIAM's iCloud Account and initiated a remote wipe
of WILLIAM's Telephone.

          a.   I know from my training and experience and my
review of publicly available materials that several hardware and
software manufacturers offer their users the ability to unlock
their devices through biometric features in lieu of a numeric or

alphanumeric passcode or password.  These biometric features
include fingerprint-recognition, face-recognition, iris-
recognition, and retina-recognition.  Some devices offer a
combination of these biometric features and enable the users of
such devices to select which features they would like to
utilize.

      b.   If a device is equipped with a fingerprint
scanner, a user may enable the ability to unlock the device
through his or her fingerprints.  For example, Apple Inc.
("Apple") offers a feature on some of its phones and laptops
called "Touch ID," which allows a user to register up to five
fingerprints that can unlock a device.  Once a fingerprint is
registered, a user can unlock the device by pressing the
relevant finger to the device's Touch ID sensor, which on a cell
phone is found in the round button (often referred to as the
"home" button) located at the bottom center of the front of the
phone, and on a laptop is located on the right side of the
"Touch Bar" located directly above the keyboard.  Fingerprint-
recognition features are increasingly common on modern digital
devices.  For example, for Apple products, all iPhone 5S to
iPhone 8 models, as well as iPads (5th generation or later),
iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro
laptops with the Touch Bar are all equipped with Touch ID.
Motorola, HTC, LG, and Samsung, among other companies, also
produce phones with fingerprint sensors to enable biometric
unlock by fingerprint.  The fingerprint sensors for these

companies have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. To activate the facial-recognition feature, a user must hold the device in front of his or her face. The device's camera analyzes and records data based on the user's facial characteristics. The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face. No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d. While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that

19

are unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light.  Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels.  A user can register one or both eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

32.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

33.  I also know from my training and experience, as well
as from information found in publicly available materials
including those published by device manufacturers, that
biometric features will not unlock a device in some
circumstances even if such features have been enabled.  This can
occur when a device has been restarted or inactive, or has not
been unlocked for a certain period of time.  For example, with
Apple's biometric unlock features, these circumstances include
when: (1) more than 48 hours has passed since the last time the
device was unlocked; (2) the device has not been unlocked via
Touch ID or Face ID in eight hours and the passcode or password
has not been entered in the last six days; (3) the device has
been turned off or restarted; (4) the device has received a
remote lock command; (5) five unsuccessful attempts to unlock
the device via Touch ID or Face ID are made; or (6) the user has
activated "SOS" mode by rapidly clicking the right side button
five times or pressing and holding both the side button and
either volume button.  Biometric features from other brands
carry similar restrictions.  Thus, in the event law enforcement
personnel encounter a locked device equipped with biometric
features, the opportunity to unlock the device through a
biometric feature may exist for only a short time.   I do not
know the passcodes of the devices likely to be found during the
search.

34.  For these reasons, if while executing the warrant, law
enforcement personnel encounter a digital device that may be
unlocked using one of the aforementioned biometric features, the

21

warrant I am applying for would permit law enforcement personnel to, with respect to Charlets Marie Hamm, Shaheed Abdul Mitchell, Marcia Denise Bullard, and Macharee Shakur Crosby, if they are present at the time the search warrant is executed: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the person's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

35.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

///

///

///

///

///

///

## VII. <u>CONCLUSION</u>

36.   For all the reasons described above, there is probable cause to believe that evidence of violations of the Subject Offense, as described above and in Attachment B of this affidavit, will be found in a search of the digital devices at the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.

_____
TRISTANY WAGNER
Postal Inspector
United States Postal
Inspection Service

Subscribed to and sworn before me
this 9th day of August, 2018.


_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

23

# EXHIBIT 1

FILED
CLERK, U.S. DISTRICT COURT

JUL 2 4 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2018 Grand Jury

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

WILLIAM CROSBY IV and
MYRON CROSBY,

      Defendants.

CR No. 18 **CR 18 00468-SJO**

I N D I C T M E N T

[18 U.S.C. § 371: Conspiracy; 18
U.S.C. § 641: Theft of Government
Property in Excess of $1,000; 18
U.S.C. § 2114(a): Robbery of
United States Property; 18 U.S.C.
§ 2(a): Aiding and Abetting]

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

    At all times relevant to this Indictment:

    1.   The United States Postal Service ("USPS") offered
"registered mail" service as an extra service for First Class or
Priority Mail shipments.  Registered mail provided end-to-end
security in sealed containers.

    2.   The USPS also transported cash proceeds from the sale of
USPS money orders and other USPS products and services in registered
mail bags via Highway Contract Route ("HCR") trucks.  HCR trucks

1   picked up registered mail and USPS cash proceeds from post offices at

2   scheduled times and brought the mail and USPS cash proceeds to

3   another USPS facility for consolidation.  Not all HCR trucks

4   traveling between USPS facilities contained USPS cash proceeds.

5        3.    Defendant WILLIAM CROSBY IV ("W. CROSBY") was employed by

6   the USPS.  Defendant MYRON CROSBY ("M. CROSBY") was not a USPS

7   employee.  Defendants W. CROSBY and M. CROSBY are half-brothers.

8   B.   OBJECTS OF THE CONSPIRACY

9        4.    Beginning on a date unknown to the Grand Jury, and

10  continuing until at least on or about March 1, 2018, in Los Angeles

11  County, within the Central District of California, and elsewhere,

12  defendants W. CROSBY and M. CROSBY, and others known and unknown to

13  the Grand Jury, knowingly conspired and agreed with each other to

14  commit the following offenses against the United States:

15        a.    Theft of Government Property in Excess of $1,000, in

16  violation of Title 18, United States Code, Section 641; and

17        b.    Robbery of United States Property, in violation of

18  Title 18, United States Code, Section 2114(a).

19  C.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

20       ACCOMPLISHED

21        5.    The objects of the conspiracy were to be accomplished, in

22  substance, as follows:

23        a.    Defendant W. CROSBY would identify USPS HCR trucks

24  containing USPS cash proceeds.

25        b.    Defendant W. CROSBY would provide information to

26  unknown co-conspirators about when USPS cash proceeds would be

27  transferred by HCR truck.

28

    c.    Based on defendant W. CROSBY's information, an unknown co-conspirator would steal USPS cash proceeds from the HCR truck.

    d.    Also based on W. CROSBY's information, co-conspirators known and unknown to the Grand Jury would display a firearm and threaten the driver of an HCR truck containing USPS cash proceeds, demand that the driver open the truck's trailer, and steal the registered mail bag containing the USPS's cash proceeds.

    e.    Defendant M. CROSBY would obtain a vehicle for use in the conspiracy.

    f.    Defendants W. CROSBY and M. CROSBY, and others known and unknown to the Grand Jury, would follow HCR trucks containing USPS cash proceeds and, during the robbery of the HCR trucks, cause vehicles to prevent the HCR trucks from escaping.

D.    OVERT ACTS

    6.    On or about the following dates, in furtherance of the conspiracy, and to accomplish its objects, defendants W. CROSBY and M. CROSBY, and others unknown to the Grand Jury, committed the following overt acts, among others, within the Central District of California:

    Overt Act No. 1:    On or before August 1, 2017, defendant W. CROSBY, an acting supervisor at the Dockweiler Post Office, 3585 Vermont Avenue, Los Angeles, California (the "Dockweiler Post Office"), told unknown co-conspirators the approximate date and time that the HCR truck carrying the registered mail bags containing USPS cash proceeds would leave the Dockweiler Post Office.

    Overt Act No. 2:    On August 1, 2017, at least two unknown co-conspirators drove in a silver sedan to the Dockweiler Post Office

1  with the intent to steal the registered mail bags containing USPS

2  cash proceeds from the HCR truck at the Dockweiler Post Office.

3      Overt Act No. 3:    On August 1, 2017, defendant W. CROSBY

4  alerted one or more unknown co-conspirators that registered mail bags

5  containing USPS cash proceeds had been transferred from the USPS

6  office to the back of the HCR truck's trailer.

7      Overt Act No. 4:    On August 1, 2017, after being alerted by

8  defendant W. CROSBY, an unknown co-conspirator exited the silver

9  sedan, walked onto the Dockweiler Post Office's loading dock, and

10  stole the USPS plastic tub from the back of the HCR truck's trailer

11  containing registered mail bags with approximately $128,236 in USPS

12  cash proceeds.

13      Overt Act No. 5:    On September 3, 2017, defendant M. CROSBY,

14  using one of his Instagram accounts, sent a photograph depicting

15  multiple rows of United States currency in $100, $50, and $20

16  denominations to defendant W. CROSBY's Instagram account.  Defendant

17  M. CROSBY characterized the photograph of United States currency as

18  "the count."

19      Overt Act No. 6:    On September 3, 2017, after sending the

20  photograph of the money, defendant M. CROSBY, using one of his

21  Instagram accounts, instructed defendant W. CROSBY to download

22  Signal, a secure messaging application, so they could "talk."

23      Overt Act No. 7:    On or before February 1, 2018, defendant

24  W. CROSBY, a USPS employee then assigned to the Wagner Post Office,

25  2200 West Century Boulevard, Los Angeles, California (the "Wagner

26  Post Office"), told unknown co-conspirators the approximate date and

27  time that the HCR truck carrying the registered mail bag containing

28  USPS cash proceeds would leave the Wagner Post Office.

Overt Act No. 8:    On February 1, 2018, after arriving home
from work at the Wagner Post Office, defendant W. CROSBY drove in a
vehicle from his residence back to the Wagner Post Office with the
intent to facilitate a robbery of the HCR truck transporting USPS
cash proceeds from the Wagner Post Office.

Overt Act No. 9:    On February 1, 2018, defendant W. CROSBY
served as a lookout during the robbery of an HCR truck carrying a
registered mail bag containing USPS cash proceeds from the Wagner
Post Office by the unknown co-conspirators to whom he provided
information.

Overt Act No. 10:    On February 1, 2018, an unknown co-
conspirator drove a white minivan head-on towards an HCR truck driven
by D.L. just outside the Wagner Post Office and stopped before
hitting the HCR truck.  The unknown co-conspirator then exited the
minivan, displayed a gun to D.L., and threatened D.L.  After D.L.
opened the trailer, the unknown co-conspirator stole the registered
mail bag containing approximately $37,658 in USPS cash proceeds.

Overt Act No. 11:    On or before March 1, 2018, defendant
W. CROSBY, who had previously worked as a supervisor at the
Dockweiler Post Office, told defendant M. CROSBY and unknown co-
conspirators the approximate date and time that the USPS truck
carrying the registered mail bags containing USPS cash proceeds would
leave the Dockweiler Post Office.

Overt Act No. 12:    On March 1, 2018, defendant W. CROSBY took
sick leave without pay from his USPS job at the Wagner Post Office.

Overt Act No. 13:    On March 1, 2018, defendant M. CROSBY sent
a text message to M.M. asking for and receiving permission to rent a

2017 White Mercedes-Benz G-Class Sport Utility Vehicle whose spare tire was missing from the rear door (the "Mercedes SUV").

Overt Act No. 14: On March 1, 2018, defendant M. CROSBY picked up the Mercedes SUV from M.M.'s apartment building's parking complex.

Overt Act No. 15: On March 1, 2018, defendant W. CROSBY traveled to the area near the Dockweiler Post Office in a vehicle to serve as a lookout and wait for the HCR truck with USPS cash proceeds to leave the Dockweiler Post Office.

Overt Act No. 16: On March 1, 2018, defendant M. CROSBY traveled in the Mercedes SUV to an Arco Gas Station, 3775 South Vermont Avenue, and waited for the HCR truck with USPS cash proceeds to leave the Dockweiler Post Office.

Overt Act No. 17: On March 1, 2018, defendant W. CROSBY acted as a lookout and followed the HCR truck in a vehicle after it departed the Dockweiler Post Office and entered and exited the 110 Freeway carrying the registered mail bag containing USPS cash proceeds.

Overt Act No. 18: On March 1, 2018, at least two unknown co-conspirators followed the HCR truck onto and off the 110 Freeway, and parked behind the HCR truck in a dark colored sport utility vehicle ("SUV 2").

Overt Act No. 19: On March 1, 2018, in the Mercedes SUV, defendant M. CROSBY followed the HCR truck after it passed the Arco Gas Station onto the 110 Freeway, stopped in front of the HCR truck before it exited the 110 Freeway, and blocked the HCR truck's ability to exit the freeway until an unidentified co-conspirator from SUV 2 behind the HCR truck displayed a gun to X.W., the driver of the HCR truck, and ordered X.W. out of the truck.

<u>Overt Act No. 20:</u>   On March 1, 2018, after ordering X.W. out of the truck at gunpoint, the unknown co-conspirator from SUV 2 ordered X.W. to open the truck's rear trailer door.  The unknown co-conspirator then grabbed the registered mail bags containing approximately $72,563 in USPS cash proceeds, and fled.

COUNT TWO

[18 U.S.C. §§ 641, 2(a)]

On or about August 1, 2017, in Los Angeles County, within the Central District of California, defendant WILLIAM CROSBY IV ("W. CROSBY") and others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly and willfully stole money and property of the United States Postal Service ("USPS"), a department and agency of the United States, having a value exceeding $1,000, namely, approximately $128,236 in USPS cash proceeds, to which defendant W. CROSBY knew he was not entitled.

## COUNT THREE

### [18 U.S.C. §§ 2114(a), 2(a)]

On or about February 1, 2018, in Los Angeles County, within the Central District of California, defendant WILLIAM CROSBY IV and others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly and intentionally robbed D.L., a person having lawful charge, custody, and control of mail matter, money, and other property of the United States, in his official capacity as United States Postal Service driver, and in doing so put the life of D.L. in jeopardy by the use of a dangerous weapon.

COUNT FOUR

[18 U.S.C. §§ 2114(a), 2(a)]

On or about March 1, 2018, in Los Angeles County, within the Central District of California, defendants WILLIAM CROSBY IV and MYRON CROSBY, and others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly and intentionally robbed X.W., a person having lawful charge, custody, and control of mail matter, money, and other property of the United States, in his official capacity as United States Postal Service driver, and in doing so put the life of X.W. in jeopardy by the use of a dangerous weapon.

A TRUE BILL

/s/
_____
Foreperson

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

SCOTT M. GARRINGER
Assistant United States Attorney
Deputy Chief, Criminal Division

CHRISTINA T. SHAY
Assistant United States Attorney
Deputy Chief, General Crimes
Section

THOMAS F. RYBARCZYK
Assistant United States Attorney
Public Corruption and Civil
Rights Section